UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHAEL W. KINCAID DDS, INC.
d/b/a RIVERSIDE FAMILY DENTAL GROUP,

      **Plaintiff,**

   v.                                Case No.: 2:16-cv-790
                                         JUDGE SMITH
                                         Magistrate Judge Deavers

**SYNCHRONY FINANCIAL,**

      **Defendant.**

## OPINION AND ORDER

This matter is before the Court upon Defendant Synchrony Financial's Motion to Dismiss (Doc. 5). Plaintiff opposed Defendant's Motion (Doc. 11) and Defendant replied in support (Doc. 13). This matter is now ripe for review. For the following reasons, Defendant's Motion is **GRANTED in part** and **DENIED in part**.

       I.    BACKGROUND

This lawsuit arises out of six faxes sent by Synchrony to Plaintiff between June 23, 2015, and August 13, 2015. Plaintiff alleges that Synchrony's faxes constitute advertisements without the opt-out language required by the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") as amended by the Junk Fax Prevention Act.

The faxes in question concern CareCredit, a health care financing product offered by Synchrony to those in need of medical care financing. Plaintiff worked with CareCredit in the past and CareCredit representatives visited Plaintiff in person every month or two to encourage Plaintiff to submit CareCredit applications for Plaintiff's patients. (Doc. 1, Compl. at ¶ 16; Doc. 11, Mem. Opp. at 12). Beginning in May 2015, Synchrony's sales tactics became more

aggressive, starting with an in-office visit where Plaintiff asked Sychrony's CareCredit representative to leave the premises. (Doc. 1, Compl. at ¶¶ 17–25). Synchrony then began calling Plaintiff three times a day to solicit CareCredit applications. (*Id.* at ¶¶ 26–28). Plaintiff then informed Syncrhony they were uninterested in any further phone calls and the faxes began. (*Id.* at ¶¶ 28–30).

Synchrony's first fax to Plaintiff occurred on June 23, 2015, and concerned "CareCredit Certification." (Doc. 1-1, June 23 Fax at PAGEID# 12). The fax noted "Action Required: Complete your CareCredit Certification." (*Id.*). In the body of the fax, it stated "We're sure you'll agree your **patients/clients rely on you** to provide them with the most accurate information so they can make care and financial decisions that are best for them." (*Id.* (emphasis in original)). The fax informed Plaintiff that the practice would lose its ability to help patients who want to pay with CareCredit because Plaintiff would no longer be able to process CareCredit applications. (*Id.*). The fax gave instructions to access CareCredit's website then directions to the Training and Learning Center sections of the website. (*Id.*).

Synchrony has provided a December 10, 2013 consent order ("Consent Order") between CareCredit and the United States Consumer Financial Protection Bureau ("CFPB") it alleges provides the basis for the faxes. (*See* Doc. 5-1, Consent Order). In the Consent Order, the CFPB found that CareCredit was committing violations of 12 U.S.C. §§ 5531 and 5536. (*Id.* at 1). One of the CFPB's primary findings was that CareCredit insufficiently trained its enrolled providers regarding the delivery of information regarding the promotional term of the card and did not monitor enrolled provider's compliance with the law or CareCredit's policies. (*Id.* at 4–5). In addition to numerous other remedial measures, the CFPB ordered CareCredit to "enhance its training curriculum for Enrolled Providers . . . " and to "retrain all Enrolled Providers within 18

months after the Bureau's approval of such training materials." (*Id.* at 10–11). This training program was allegedly the training program referred to in CareCredit's first fax and four of the following five faxes.

Sychcrony's second fax, on July 15, 2015, asked "Will You Help Us?" and encouraged Plaintiff to join the other "186,000 practices that accept CareCredit to complete a short online training session so they are prepared with the most up-to-date information should a patient/client walk in with a CareCredit credit card and request to use it at the practice."[1] (Doc. 1-1, July 15 Fax at PAGEID# 13). It further stated, "[t]his happens quite frequently because CareCredit is used, on average, 38,000 times a day! And another 189,000 new cardholders, on average, are approved every month. According to our records, **you are one of the few remaining practices yet to complete this simple training.**" (*Id.* (emphasis in original)). The fax again warned Plaintiff that the practice would be suspended if the training was not completed. (*Id.*).

The July 21, 2015 fax concerned a data migration project Synchrony was undertaking for CareCredit and informed Plaintiff that the website may be unavailable but that practices could process CareCredit transactions as normal, that there would be minimal impact to processing transactions and that practices could call "Provider Services" with immediate needs. (Doc. 1-1, July 21 Fax at PAGEID# 14). The fax noted that the migration was "to a **new, state-of-the-art data center**," and that the "long-term benefit is that we will have a **new, state-of-the-art data processing infrastructure** to continue serving your needs and protecting practice and patient/client data." (*Id.* (emphasis in original)).

---

[1] The Court notes that failure to complete certification did not impact a practice's ability to accept CareCredit cards; rather, failure to complete certification would result in a suspension of the practice's ability to process applications, not payments. (*See generally*, Doc, 1-1, June 23 Fax at PAGEID# 12).

On July 27, 2015, Synchrony faxed about CareCredit again, informing Plaintiff that the certification deadline passed and that Plaintiff's "ability to submit CareCredit applications will be suspended" unless an employee completed the training as soon as possible. (Doc. 1-1, July 27 Fax at PAGEID# 15). The fax stated "**I'd like to ask for your assistance**. Your patients/clients rely on your team to provide them with the most accurate information, especially when it comes to financing their care." (*Id.* (emphasis in original)). The fax also suggested "Providing patients/clients with accurate information is our common goal and a requirement when offering the CareCredit program."

On August 6, 2015, Synchrony faxed Plaintiff a fifth time, notifying Plaintiff that "Your deadline to complete CareCredit Certification has Passed–Application Suspension will Follow." (Doc. 1-1, August 6 Fax at PAGEID# 16). The August 6 fax again noted that "out of **more than 185,000** practices nationwide, you're among the few who have not completed the sample, 25-minute, online training . . . ." (*Id.* (emphasis in original)). Last, the August 6 fax informed Plaintiff that "if a patient/client wants to apply for the CareCredit health, wellness, and beauty credit card at your practice, so they can get the care they/their pets need and want, you will be unable to help them until you have completed Certification and have been reinstated." (*Id.*).

On August 12, 2015, Plaintiff received the final fax in question from Synchrony. (Doc. 1-1, August 13 Fax at PAGEID# 18). Synchrony's fax informed Plaintiff that Plaintiff could no longer submit new CareCredit applications because Plaintiff's account was suspended. (*Id.*). The fax further explained the consequences of the suspension and how Plaintiff could get the suspension lifted. (*Id.*). The fax also noted that "[i]n 2014 alone, more than 26 million new cardholders were approved for CareCredit. These are patients/clients who may not have been able to get needed or wanted care for themselves or their pets if they had not had the opportunity

4

to apply for CareCredit with the help of their provider." (*Id.*). The fax encouraged Plaintiff to complete the reinstatement process "to continue helping <u>patients/clients who desire a financing solution or prefer to use special financing to pay for treatment</u> . . . ." (*Id.* (emphasis in original)).

Plaintiff filed this action on August 15, 2016, alleging violations of the TCPA and requesting injunctive relief on behalf of itself and an alleged class who received the same or similar faxes from Defendant. Defendant now moves to dismiss the Complaint in its entirety.

## II. STANDARD OF REVIEW

Defendant brings this motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, alleging that Plaintiff failed to state a claim upon which relief can be granted.

Under the Federal Rules, any pleading that states a claim for relief must contain a "short and plain statement of the claim" showing that the pleader is entitled to such relief. Fed. R. Civ. P. 8(a)(2). To meet this standard, a party must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A claim will be considered "plausible on its face" when a plaintiff sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 12(b)(6) allows parties to challenge the sufficiency of a complaint under the foregoing standards. In considering whether a complaint fails to state a claim upon which relief can be granted, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to

threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. Thus, while a court is to afford plaintiff every inference, the pleading must still contain facts sufficient to "provide a plausible basis for the claims in the complaint"; a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *Flex Homes, Inc. v. Ritz-Craft Corp of Mich., Inc.*, 491 F. App'x 628, 632 (6th Cir. 2012); *Iqbal*, 556 U.S. at 679.

## III. DISCUSSION

Defendant moved to dismiss both of the claims in the Complaint, arguing that none of the faxes are advertisements under the TCPA and that injunctive relief is not a cause of action. Defendant argues that the Consent Order should be judicially noticed and provides necessary background for understanding the purpose of the faxes. Plaintiff argues that the Consent Order did not require Defendant to send the faxes and that Synchrony's aggressive sales tactics around the time the faxes started arriving provide evidence that the faxes served a purpose beyond simply offering the certification training. Plaintiff also argues that injunctive relief is a standalone cause of action under the TCPA.

### A. The Faxes are Alleged to be Advertisements

The TCPA provides: "[t]he term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227. The Sixth Circuit recently ruled on a TCPA case and expounded on the definition of what makes a fax an advertisement in *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.* 788 F.3d 218, 222 (6th Cir. 2015). This Court has recently summarized *Sandusky's* discussion of the statute:

> The Sixth Circuit considered the definition in the TCPA and added to it using various dictionaries. *Sandusky*, 788 F.3d at 222. Ultimately, the Sixth Circuit held that "[a]n advertisement is any material that promotes the sale (typically to the public) of any property, goods, or services available to be bought or sold so some entity can profit." *Id.*

*Swetlic Chiropractic & Rehab. Ctr., Inc. v. Foot Levelers, Inc.*, No. 2:16-CV-236, -- F. Supp. 3d --, 2017 WL 373514, at *5 (S.D. Ohio Jan. 26, 2017) (Smith, J.).

Here, the faxes are not as clear-cut as the fax in *Sandusky*, where the Sixth Circuit found that two faxes which listed "medications available in the health plans of the chiropractors' patients." 788 F.3d at 220. In *Sandusky*, there was evidence showing that the sender "ha[d] no interest whatsoever in soliciting business from [the recipient]." *Id.* at 222. The Sixth Circuit found that the faxes were not advertisements because the sender did not seek pecuniary gain from the recipient of the recipient's patients. *Id.*

The Court accepts that the Consent Order required Synchrony to retrain all of its enrolled providers within eighteen months, but that does not necessarily mean that Synchrony's only possible purpose in sending the faxes was compliance with the Consent Order. It is entirely possible that Synchrony's faxes served a larger goal of re-introducing its products to providers who were not actively providing CareCredit applications. The mere fact that "nothing on the face of the fax . . . serves as an explicit sale offer," does not conclusively establish that the fax was not a pretext for commercial solicitation. *Physicians Healthsource, Inc. v. Stryker Sales Corp.*, 65 F. Supp. 3d 482, 491 (W.D. Mich 2015). However, the Sixth Circuit has also positively cited *Physicians Healthsource, Inc. v. Multiplan Servs., Corp.*, No. 12-11693, 2013 WL 5299134, at *2 (D. Mass. Sept. 18, 2013), for the proposition that a fax should be viewed "on the four corners of the facsimile" and that a determination should not be made on an "ancillary, remote, and hypothetical economic benefit." *Sandusky*, 788 F.3d at 225.

7

There is no doubt that the pre-existing relationship between Plaintiff and Defendant complicates this matter. The FCC recently ruled on a how similar relationships change the nature of certain faxes, noting that "messages whose purpose is to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender are not advertisements for purposes of the TCPA's facsimile advertising rules." *Rules and Regs. Implementing the TCPA; Junk Fax Prevention Act of 2005*, 71 FR 25967-01, 25972 (2006). While some such transactions are more explicit—e.g. receipts and invoices are not advertisements while travel deals and bonus commission offers would be advertisements—the faxes in question here are both informational and still touting the benefits and purpose of the CareCredit card. *Id.* at 25972–5973. The FCC also noted that for such communications to fall outside of the definition of an advertisement, the communication "must relate specifically to existing accounts **and** ongoing transactions." *Id.* (emphasis added). Regarding changes in terms or features, the FCC stated the communication must be relating to an item or service already purchased or a product or service the recipient is already using. *Id.* at 25972.

Based on the allegations in the Complaint and the faxes present, the Court finds that the remaining faxes are sufficiently alleged to be advertisements at this stage to survive the Motion to Dismiss. First, the faxes note the number of providers who use CareCredit, the number of patients who sign up for CareCredit and use it, and that a practice's patients rely on the practice to provide them with CareCredit information. The faxes also ask the practice to help CareCredit, specifically titling one of the faxes, "Will You Help Us?" (Doc. 1-1, July 15 Fax at PAGEID# 13). Another fax specifically states, "I'd like to ask for your assistance." (Doc. 1-1, July 27 Fax at PAGEID# 15). Even in the suspension notification from Care Credit, the fax still notes "In 2014 alone, more than 2.6 million new cardholders were approved for CareCredit. These are

patients/clients who may not have been able to get needed or wanted care for themselves . . . if they had not had the opportunity to apply for CareCredit with the help of the their provider. (Doc. 1-1, August 13 Fax at PAGEID# 18). By including this language in the faxes, Synchrony is making clear that Plaintiff's cooperation would help Synchrony get more card holders approved for the CareCredit card.

The economic benefits to Synchrony from sending such faxes are clear. Synchrony makes money from patients using the CareCredit cards and if the practice helps more people sign up for cards, then more patients will use the card. Even though the training was required by the Consent Order, there is no doubt that CareCredit wants to keep every provider current on the training so the providers can sign up patients for the card to benefit CareCredit. The Consent Order is not mentioned on the face of the document, and thus the Court need not accept Defendant's contention that the sole purpose of the faxes was to comply with the Consent Order. Defendant argues that the Consent Order "helps establish the context for why Synchrony sent the faxes to Plaintiff," but the Consent Order does not conclusively establish that the only reason Synchrony sent the faxes was compliance with the Consent Order. In fact, Synchrony's second fax implies that the training concerns times when "a patient/client walk[s] in with a CareCredit credit card and request[s] to use it at the practice," even though the training or failure to complete the training would have no effect on a practice's ability to accept a CareCredit card as a form of payment. (Doc. 1-1, July 15 Fax at PAGEID# 13). This kind of misleading information could be read as an attempt to trick practices into attending a training that benefits Synchrony more than the practice. The Court finds that these faxes are not conclusively transactional in nature because there is no allegation that Synchrony and Plaintiff had any continuing relationship regarding CareCredit applications and because the faxes are extolling the benefits of CareCredit

cards to the recipient of the faxes. The language in the faxes promoting CareCredit is sufficient to show, at this stage, that the faxes are alleged to have been the kind of "pretext for a commercial solicitation" the Sixth Circuit recognized in *Sandusky*. 788 F.3d at 225.

The July 21, 2015 fax is also sufficiently alleged to be an advertisement. Although it is possible that the sole purpose of sending the fax was to report the outage, Synchrony's use of bold text to highlight the quality of its data center and that the infrastructure would help serve Plaintiff's needs is evidence that the outage reporting may have been a pretext to promote CareCredit. Additionally, while Synchrony and Plaintiff had a relationship, the fax indicates that the outage would not affect Plaintiff's ability to process CareCredit transactions and would minimally affect Plaintiff's ability to process applications or payments on a Sunday morning. Accordingly, Defendant's Motion to Dismiss Count I is **DENIED** as to each of the faxes.

**B.     Injunctive Relief**

As to Plaintiff's second claim, the Court agrees with Defendant that "[i]njunctive relief is a remedy for a claim, not a cause of action unto itself." *Allen v. Andersen Windows, Inc.*, 913 F. Supp. 2d 490, 516 (S.D. Ohio 2012) (Frost, J.). Even though the TCPA specifically mentions injunctive relief, the applicable section does not provide for injunctive relief as a cause of action, but rather, allows a plaintiff to seek injunctive relief as a remedy for a violation of the TCPA. *See* 47 U.S.C. § 227(b)(3)(a). To the extent Plaintiff seeks injunctive relief as a remedy, such remedy is not dismissed or foreclosed by this ruling, but injunctive relief as a claim is not authorized by the TCPA or the civil rules and accordingly, is **DISMISSED**.

## IV. CONCLUSION

Based on the foregoing, Synchrony's Motion to Dismiss Plaintiff's Claim for a Violation of the TCPA is **DENIED** and Synchrony's Motion to Dismiss Plaintiff's Injunctive Relief Count is **GRANTED**. The Clerk shall **REMOVE** Document 5 from the Court's pending motions list.

**IT IS SO ORDERED.**

                                           */s/ George C. Smith*
                                           **GEORGE C. SMITH, JUDGE**
                                           **UNITED STATES DISTRICT COURT**